2002 SD 119

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Richard HERRMANN, Defendant and Appellant.**

No. 22045.

Supreme Court of South Dakota.

Considered on Briefs March 25, 2002.

Reassigned Aug. 5, 2002.

Decided Oct. 2, 2002.

Mark Barnett, Attorney General, Patricia Archer, Assistant Attorney General,

Pierre, South Dakota, Attorneys for plaintiff and appellee.

Terry J. Sutton and Tracy J. Niemann of Sutton & Bauer Law Office, Watertown, South Dakota, Attorneys for defendant and appellant.

KONENKAMP, Justice (on reassignment).

[¶ 1.] When an officer mistakenly requires an arrested driver to submit to a blood test because a law enforcement dispatcher erroneously reports that the driver has multiple prior convictions, should the trial court suppress the blood test results or simply deprive the prosecution of the use of the statutory presumptions? Because there was no constitutional violation here in seizing the driver's blood, we adhere to our longstanding precedent and hold that the correct sanction for the erroneous seizure is to deny the State the use of the statutory presumptions as evidence. We also determine that the arresting officer had sufficient reasonable suspicion to stop the driver, founded on an anonymous tip and the driver's speeding. We affirm.

Background

[¶ 2.] Trooper Rick Steiner, a thirteen-year veteran of the South Dakota Highway Patrol assigned to the Watertown area, was on duty on the night of October 6, 2000. At the end of his shift at approximately 11:22 p.m., he was pulling into the parking lot of the law enforcement center in Watertown when he received a message from dispatch: an unknown person had called, "advising of a possible intoxicated driver" driving a 1962 yellow Chevrolet pickup southbound on Sioux Conifer Road near Watertown. Dispatch also provided Steiner with the license number of the vehicle. Steiner immediately proceeded west on Highway 20 and, as he approached the intersection with Sioux Conifer Road, he observed the vehicle described by dispatch turn from the road onto the highway. The vehicle pulled into an eastbound lane of the four-lane highway and headed toward Watertown traveling in the opposite direction as Steiner.

[¶ 3.] Steiner met and passed the other vehicle and then made a U-turn through the median and followed it. The trooper confirmed that the license number of the vehicle matched the one given by dispatch and kept pace with it as it passed into a thirty-five mile per hour zone. Steiner was traveling at approximately forty-five miles per hour and used his radar to confirm his own speed. Based upon that information, he formed the opinion that the other vehicle was speeding. Thus, at approximately 11:27 p.m., about five minutes after receiving the initial call from dispatch, Steiner activated his red lights and pulled the speeding vehicle over.

[¶ 4.] Steiner approached the driver, asked for his driver's license, and identified him as Herrmann. When Steiner asked Herrmann if he had been drinking, Herrmann replied that he had not. Nevertheless, Steiner noted that Herrmann had an odor of an alcoholic beverage and watery, glassy eyes. Steiner instructed Herrmann to come back to the patrol car where he asked him how much he had to drink. Herrmann replied that he had a couple of beers. At that point, Steiner could still smell an alcoholic beverage odor, so he asked Herrmann to perform some field sobriety tests. When Herrmann's performance on these tests proved unsatisfactory, Steiner placed him under arrest for driving while under the influence (DUI). Steiner then read Herrmann the implied consent warnings and the Miranda warnings.[1] Herrmann refused to submit

1. The implied consent warnings are contained in SDCL 32–23–10, which provides:

to a blood test as requested in the implied consent warnings. However, Steiner was advised by dispatch at about the same time that Herrmann had two DUI convictions in the previous five years. With that information, Steiner informed Herrmann that a blood test was mandatory and took him to the local hospital where blood was drawn.[2] Herrmann was then transported to a local detention center.

[¶ 5.] Herrmann's blood test yielded a result of 0.171 percent by weight of alcohol. Accordingly, he was charged with one count of driving or actual physical control of a motor vehicle while under the influence of an alcoholic beverage (SDCL 32–23–1(2)). A part two information was also filed alleging that Herrmann had two prior DUI convictions. The information was later amended to allege only one prior conviction. Before trial, Herrmann's counsel moved to suppress all evidence obtained as a result of the stop of Herrmann's vehicle on the basis that the stop was illegal.

After a hearing, the trial court entered a memorandum decision, findings of fact, conclusions of law, and an order denying the motion to suppress.

[¶ 6.] On the first day of trial, Herrmann's counsel filed a motion to suppress the blood test results for violation of Herrmann's right to refuse the test. Counsel argued that, despite the dispatcher's advice at the time of the arrest that Herrmann had two prior DUI convictions and thus could not refuse the test, Herrmann had only one prior DUI conviction. Therefore, counsel contended that Herrmann had a right to refuse the blood test and that its administration over Herrmann's refusal required suppression of the results. The trial court denied the motion to suppress. However, the court also denied the State the benefit of a jury instruction on the statutory presumptions of intoxication that result from a blood alcohol test. *See* SDCL 32–23–7.[3]

Any person who operates any vehicle in this state is considered to have given consent to the withdrawal of blood or other bodily substance and chemical analysis of the person's blood, breath, or other bodily substance to determine the amount of alcohol in the person's blood and to determine the presence of marijuana or any controlled drug or substance.

The person shall be requested by the officer to submit to the withdrawal of blood or other bodily substance for chemical analysis or chemical analysis of the person's breath and shall be advised by the officer that:

(1) If the person refuses to submit to the withdrawal or chemical analysis, no withdrawal or chemical analysis may be required unless the person has been arrested for a third, fourth, or subsequent violation of § 32–23–1, constituting a felony offense under § 32–23–4 or 32–23–4.6 or has been arrested for vehicular homicide under § 22–16–41 or vehicular battery under § 22–16–42;

(2) If the person refuses to submit to the withdrawal or chemical analysis, the per-

son's driver's license shall be revoked for one year, unless pursuant to § 32–23–11.1 the person pleads guilty to a violation of § 32–23–1 or 32–23–21, prior to a revocation order being issued; and

(3) The person has the right to have a chemical analysis performed by a technician of the person's own choosing at the person's own expense, in addition to the test requested by the officer.

2. Under the implied consent law, a person being arrested for a third, fourth or subsequent DUI offense has no right to refuse to submit to a blood test. *See* SDCL 32–23–10(1) at n. 1, *supra.*

3. At the time of Herrmann's arrest and conviction, SDCL 32–23–7 (Supp. 2001) provided:

In any criminal prosecution for a violation of § 32–23–1 relating to driving a vehicle while under the influence of intoxicating liquor, a violation of § 22–16–41, or a violation of § 22–16–42, the amount of alcohol in the defendant's blood at the time alleged as shown by chemical analysis of the defen-

[¶ 7.] Following a jury verdict of guilty, Herrmann admitted his status as a second time DUI offender.[4] The circuit court sentenced him to ninety days in the county jail with seventy-five days suspended and a fine of $375. He was also required to reimburse certain costs and expenses. Herrmann appeals, asserting two issues: (1) Was the unreliable anonymous tip corroborated by the officer, thereby providing an articulable and reasonable suspicion for the initial stop? (2) Should the blood test result be suppressed due to a State dispatch officer's error, regarding the number of prior DWI convictions, which eliminated Herrmann's right of refusal?

[¶ 8.] **Reasonable Suspicion to Stop Vehicle.**

[¶ 9.] A motion to suppress for an alleged violation of a constitutionally protected right raises a question of law, requiring de novo review. *State v. Stanga*, 2000 SD 129, ¶ 8, 617 N.W.2d 486, 488 (citations omitted). We review findings of fact under the clearly erroneous standard. *Id.* Once the facts have been determined, however, the application of a legal standard to those facts is a question of law reviewed de novo. *Id.*

[¶ 10.] Herrmann argues that trooper Steiner stopped his vehicle without reason-able suspicion of a violation of law and that, as a result, the stop was illegal. *See State v. Faulks*, 2001 SD 115, ¶ 8, 633 N.W.2d 613, 616. He contends that the trial court should have suppressed all evidence seized after the stop. Contrary to Herrmann's assertions, however, Trooper Steiner had two reasons for stopping Herrmann's vehicle: the anonymous tip to law enforcement and Herrmann's speeding. The anonymous tip provided trooper Steiner with a reasonable suspicion that Herrmann was driving while under the influence of an alcoholic beverage and gave Steiner an articulable basis to stop the vehicle.

[¶ 11.] A similar case was presented in *State v. Olhausen*, 1998 SD 120, ¶ 8, 587 N.W.2d 715, 718. In *Olhausen*, an anonymous caller reported a possible drug deal on East Rice Street in Sioux Falls, named the suspect involved, gave a cursory description of him, described the car involved, and gave its license plate number. These facts were relayed to a law enforcement officer in the area who spotted the car and noted that the front seat passenger fit the description of the suspect. In upholding the stop, we observed:

> [The officer] was able to independently corroborate the tip and verify the infor-

dant's blood, breath, or other bodily substance shall give rise to the following presumptions:
(1) If there was at that time five hundredths percent or less by weight of alcohol in the defendant's blood, it shall be presumed that the defendant was not under the influence of intoxicating liquor;
(2) If there was at that time in excess of five hundredths percent but less than ten hundredths percent by weight of alcohol in the defendant's blood, such fact shall not give rise to any presumption that the defendant was or was not under the influence of intoxicating liquor, but such fact may be considered with other competent evidence in determining the guilt or innocence of the defendant;

(3) If there was at that time ten hundredths percent or more by weight of alcohol in the defendant's blood, it shall be presumed that the defendant was under the influence of intoxicating liquor.
Percent by weight of alcohol in the blood shall be based upon milligrams of alcohol per 1.0 cubic centimeters of whole blood or 2100 cubic centimeters of deep lung breath.

4. The final amended judgment in the settled record recites that Herrmann was convicted after a guilty plea and makes no specific mention of his admission of his status as a two-time DUI offender. This recitation is clearly controverted by the settled record and the parties' version of the facts and, accordingly, we disregard it as a drafting error.

mation before he made the stop: the BMW fit the tipster's description, the license plate number matched the number reported by the tipster, and the car was located close to East Rice Street. Lastly, [the officer] testified that, as he drove by, he could see that the passenger in the front of the vehicle met the description given to him of [the suspect]. The motion to suppress was properly denied.

*Id.* Almost all these factors are present here. The unique vehicle, a 1962 yellow Chevrolet pickup, fit the tipster's description, the license plate number matched the number reported by the tipster, and the vehicle was located turning off of Sioux Conifer Road, the location identified by the tipster. Clearly the stop was not the product of the trooper's whim, caprice, or idle curiosity. *See id.*

[¶ 12.] Another similar case was presented in *State v. Lownes,* 499 N.W.2d 896, 900 (S.D.1993). There, an anonymous caller informed the police dispatcher in Rapid City that he thought someone named Mike had been drinking and was driving under the influence. The caller further informed dispatch that "Mike" did not possess a license, was out on bond from a previous DUI, had just left the Piedmont area driving a Harley Davidson motorcycle with red tanks and black saddlebags, was heading east on Interstate 90 to the West Boulevard exit to Rapid City and that he would proceed to Allen Street. These facts were relayed to a Highway Patrol Trooper and, approximately fifteen minutes later, the trooper stopped a vehicle matching the caller's description in the area the caller had identified. In reviewing the stop on appeal, we wrote:

Trooper Welch received specific information relayed from a concerned citizen about a suspected violation of the law.

The information included a description of a distinctive motorcycle, the name of the driver, the location the motorcycle left from, a direction and highway route for the motorcycle, the particular exit the bike would use to exit the highway and a specific street destination. When the officer looked for a motorcycle matching the given description, driven by a man, proceeding down the indicated highway in the direction predicted—he found it. After Trooper Welch verified significant aspects of the information, there existed adequate reasonable suspicion to justify a *Terry* stop.

We find the trial court did not err in denying Lownes' motion to suppress evidence derived from the stop of the motorcycle.

*Id.*

[¶ 13.] A like conclusion is required here. Trooper Steiner received specific information relayed from a concerned citizen about a suspected violation of the law. The information included a description of a distinctive pickup, the location the pickup left from, and the direction and route of the pickup. When, only five minutes later, the trooper looked for a pickup matching the given description proceeding down the indicated roadway in the direction provided, he found it. Thus, there existed adequate reasonable suspicion to justify the stop of the pickup.

[¶ 14.] In addition to the foregoing, Steiner saw Herrmann speeding.[5] Although Herrmann attempts to exclude this aspect of the stop on the basis that Steiner did not independently verify his speeding by radar, such verification is not required even to sustain a speeding *conviction.* In *State v. Macy,* 294 N.W.2d 435, 436 (S.D. 1980), we upheld a speeding conviction

---

5. Herrmann was issued a warning for the speeding violation.

where the pursuing officer paced the defendant's vehicle for approximately a mile traveling at a rate of eighty-five miles per hour. In reviewing the sufficiency of the evidence on appeal, we wrote:

> The defendant denied he was speeding. It is his position on appeal that since the state trooper did not activate his radar unit he failed to utilize the most scientific means at his disposal to establish credible evidence as to speed. It appears, however, from other evidence that the radar units in the South Dakota Highway Patrol cars cannot be used to clock the speed of a car traveling in the same direction.

> * * *

> A review of the record persuades us that there was substantial evidence whereby the defendant could be found guilty as charged beyond a reasonable doubt.

*Id.* If radar verification of speeding is not essential to sustain a conviction under the "beyond a reasonable doubt" standard, clearly it is not essential to sustain a vehicle stop under the lower "reasonable suspicion" standard.

■ [¶ 15.] With the anonymous tip about Herrmann's driving while under the influence in combination with his speeding violation committed in trooper Steiner's presence, reasonable suspicion of a violation of law existed sufficient to support the stop of Herrmann's vehicle. *See State v. Thompson*, 295 N.W.2d 8 (S.D.1980)(radio call detailing information about a possible drunk driver and sheriff's pursuit of speeding vehicle for three miles gave cause for investigatory stop of vehicle). The trial court did not err in denying Herrmann's motion to suppress evidence on this foundation.

**[¶ 16.] Sanction for Improper Blood Seizure**

■ [¶ 17.] In his second issue, Herrmann argues that the trial court erred in denying his motion to suppress his blood test result as evidence for violation of the implied consent law and his statutory right to refuse the test. *See* SDCL 32–23–10. However, within constitutional limits, a person can be forced to submit to a test of bodily fluids, so long as the seizure is (1) incident to a lawful arrest, (2) taken by a reliable and accepted method, (3) in a medically approved, reasonable manner, and (4) with probable cause to believe the evidence sought exists. *State v. Nguyen*, 1997 SD 47, ¶ 10, 563 N.W.2d 120, 122 (citing *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); *South Dakota v. Neville*, 459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983)). Here, the trial court specifically found that the four *Schmerber* requirements set forth above were met, and Herrmann does not challenge that finding on appeal. Thus, there was no constitutional impediment to admission of the blood test results in evidence.

[¶ 18.] Concerning the violation of the implied consent law and Herrmann's statutory right to refuse the blood test, we noted in *Nguyen* that in felony cases it has

> never held that suppression of the blood evidence was the proper sanction for failure to comply with the implied consent statute. In prior felony cases, we have determined the penalties of 1) prohibiting the State from revoking the license of the driver, and 2) refusing to permit the use of the statutory presumptions at trial, sufficiently deter police from seizing blood evidence without the implied consent warning.[6]

---

6. The only cases where this Court has held that blood test evidence should have been suppressed for violation of the implied consent law have involved prosecutions under

*Nguyen,* 1997 SD 47 at ¶ 16, 563 N.W.2d at 124 (footnote added). Thus, in *State v. Jacobson,* 491 N.W.2d 455 (S.D.1992), where it appeared that the arresting officer may have acted in bad faith in failing to investigate whether a DUI suspect had sufficient prior convictions to require forfeiture of his statutory right to refuse the blood test, we held that the remedy would only extend to the loss of the State's right to revoke the suspect's license for refusing the blood test and the State's forfeiture of the statutory "under the influence presumptions." *Jacobson,* 491 N.W.2d at 459.

■ [¶ 19.] A blood test is arguably the best evidence for a jury to consider when deciding whether a driver was under the influence of alcohol. *Peterson v. State,* 261 N.W.2d 405, 408 (S.D.1977). It is true that in 1976 this Court decided that a chemical analysis for blood alcohol content should be suppressed if the State failed to comply with the implied consent law. *State v. Buckingham,* 90 S.D. 198, 240 N.W.2d 84 (1976). A year later, however, the issue was reexamined in *State v. Hartman,* 256 N.W.2d 131, 134–135 (S.D.1977). There, we held that despite the fact that the Legislature created a specific right for a driver to refuse to submit to a test to determine the blood alcohol content of his blood, failure to comply with the procedure set forth in the implied consent statutes does not require suppression of the test results, as long as the testing procedure complied with the driver's constitutional rights. There was no constitutional violation here.

SDCL 32–23–1(1), driving or physical control of a motor vehicle with 0.10 percent or more by weight of alcohol in the blood. *See State v. Parker,* 444 N.W.2d 42 (S.D.1989). This is because loss of the statutory presumptions of intoxication is no deterrent to noncompliance with the implied consent law in prosecutions under this provision. As noted in *State v. Tucker,* 533 N.W.2d 152, 155 (S.D.1995), the

■ [¶ 20.] We discern no need to increase the sanctions when police officers make good faith but mistaken violations of the implied consent laws. Considering the relatively few instances where this issue has arisen out of the thousands of DUI arrests that have occurred in this state, we have little indication that South Dakota's law enforcement officers are routinely disregarding the law. On the contrary, all indications are that officers are complying with the implied consent law. As the Wisconsin Supreme Court wrote in *State v. Zielke,* 137 Wis.2d 39, 403 N.W.2d 427, 434 (Wis.1987), "[t]he implied consent law is an important weapon in the battle against drunk driving in this State. Neither the law, its history or common sense allows this court to countenance its use as a shield by the defense to prevent constitutionally obtained evidence from being admitted at trial." Denying the State the use of the statutory presumptions is enough of a sanction, especially considering the gravity of the problem with intoxicated drivers on our roads.

[¶ 21.] The circuit court found that trooper Steiner acted in good faith in requiring the blood test and required the State to forfeit the benefit of the statutory under the influence presumptions. This was in full accord with settled law and, therefore, the court committed no error in denying Herrmann's motion to suppress his blood test results as evidence.

[¶ 22.] Affirmed.

State's benefit from the admission of improperly obtained blood test results in prosecutions under SDCL 32–23–1(1) is obvious. Therefore, suppression of the blood test evidence in such cases has been found necessary. *See Parker, supra.* This case did not involve a prosecution for violation of SDCL 32–23–1(1).

[¶ 23.] GILBERTSON, Chief Justice, and GORS, Acting Justice, concur.

[¶ 24.] SABERS, Justice, and AMUNDSON, Justice, concur in part and dissent in part.

[¶ 25.] ZINTER, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.

SABERS, Justice (concurring in part and dissenting in part).

[¶ 26.] I concur on Issue One but dissent on Issue Two. I would hold that the trial court erred in denying Herrmann's motion to suppress his blood test result as evidence because of the violation of the implied consent law and Herrmann's statutory right to refuse the test. *See* SDCL 32–23–10(1) which provides:

> If the person refuses to submit to the withdrawal or chemical analysis, no withdrawal or chemical analysis may be required unless the person has been arrested for a third, fourth, or subsequent violation of § 32–23–1, constituting a felony offense under § 32–23–4 or 32–23–4.6 or has been arrested for vehicular homicide under § 22–16–41 or vehicular battery under § 22–16–42[.]

[¶ 27.] The statement from *Nguyen*, quoted in the majority opinion, that this Court has never held suppression of blood evidence to be the proper sanction for failure to comply with the implied consent law does not completely or accurately represent the history of the implied consent law. In fact, this Court held at one time that suppression of evidence was the proper sanction for noncompliance with the implied consent law. In *Buckingham*, 90 S.D. at 204–205, 240 N.W.2d at 87 this Court made the following observations in this regard:

> [T]he failure of the arresting officer to comply with the requirements of SDCL 32–23–10 [*i.e.*, the implied consent law] rendered the test results inadmissible at defendant's trial. . . . In reaching this result, we look . . . to the letter of the law. It is difficult to see how the legislature could have been more specific in setting forth the procedure that arresting officers must follow when they seek to utilize the powerful evidence-gathering mechanism conferred upon them by SDCL 32–23–10, the implied consent statute. True, our statute does not expressly state that the failure of the officer to comply with the procedural steps will render the test results inadmissible, as do some implied consent statutes. Implicit in our implied consent statute, however, is the right to refuse to submit to a test and, a fortiori, the requirement that a choice be made between submitting to the test or suffering the consequences of such refusal. Also implicit in the implied consent law is the assumption that the choice to be made is of considerable importance to the arrested driver. Although it may be true that to some drivers the loss of their license for a period of one year would be a penalty more severe than being convicted of the offense of driving while intoxicated, there no doubt are some who would rather suffer the loss of their license for one year than to suffer the ignominy of a conviction for driving while intoxicated, together with the adverse economic consequences such a conviction entails. If the offense of driving while intoxicated is considered serious enough to warrant the constitutional guarantee of a jury trial, then surely it is serious enough to require law enforcement officers to comply with the statutorily mandated procedural steps as a prerequisite to the admissibility of the results of a chemical test conducted pursuant to the

implied consent law. (some citations omitted).

[¶ 28.] Only a year after *Buckingham*, this Court reconsidered its holding as to the suppression of evidence with the following analysis:

[E]vidence obtained in violation of statutory rights is not inadmissible per se unless the statutory rights are of constitutional proportions or there exists no other method of deterring future violations of the rights which the legislature has granted to its citizens.

\* \* \*

Our implied consent law does not provide that the bodily substance sample or test results are inadmissible at a subsequent prosecution where the sample is obtained without compliance with the implied consent statutes, as some states have done. However, it appears that the implied consent statutes within themselves provide a sufficient deterrent to violation of the implied consent statutes by police officers without excluding this highly probative evidence.

If there is not substantial compliance with the implied consent statutes, the department of public safety cannot revoke or suspend the operator's driving privileges for refusing to submit to such tests. Furthermore, noncompliance with the implied consent statutes, although not making the test sample and test results inadmissible, results in a forfeiture of the statutory presumptions of SDCL 32–23–7. Therefore, the physiological effects of the blood alcohol content upon the defendant must be proven by the testimony of a properly qualified expert, not by statutory presumptions. As expressed in *State v. Spry*, 87 S.D. 318, 207 N.W.2d 504 (1973) the jury should only be instructed concerning the presumption of intoxication where prop-

erly administered test results are available. Proper administration requires substantial compliance with the implied consent statutes. In this case, there was no compliance with the implied consent statutes; however, all of the Fourth Amendment requirements of *Schmerber* were met, i.e., a lawful arrest, probable cause, a reliable method, and a reasonable, medically accepted removal of defendant's blood. The blood sample and the test results were therefore admissible but not the subject of the statutory presumptions of physiological effects of blood alcohol content.

*Hartman*, 256 N.W.2d at 135–36.

[¶ 29.] This Court is now at a juncture where its analysis in *Buckingham* has proven to be more accurate than that in *Hartman*. Subsequent cases before this Court establish that inability to revoke driving privileges and forfeiture of statutory presumptions of intoxication are inadequate means of consistently deterring law enforcement violation of the implied consent law. In *Hartman* itself, this Court noted that a DUI prosecution under SDCL 32–23–1(1)(driving with 0.10 percent or more by weight of alcohol in the blood) would not be subject to the same deterrent effect as a DUI prosecution under SDCL 32–23–1(2)(driving under the influence) and that the exclusionary rule might be needed in a prosecution under subsection (1) if the implied consent statutes were not complied with. *See Hartman*, 256 N.W.2d at 135, n. 12. That was exactly the case in *Parker*, *supra* at n. 6 where the arresting officer failed to read the implied consent warnings, a blood test was taken and the defendant was later charged with a violation of SDCL 32–23–1(1). On these facts, this Court held that it was reversible error for the trial court to admit the defendant's blood test result into evidence.

[¶ 30.] More disturbing than *Parker*, was *Jacobson, supra* where a blood test was administered pursuant to the arresting officer's instruction that the test was mandatory. However, the record failed to reflect any steps taken by the officer to confirm that the arrest was for the defendant's third DUI.[7] Moreover, the officer's testimony was inconsistent and incredible as to whether or not he knew the arrest was for a third DUI when the test was administered. Nevertheless, the blood test result was admitted into evidence and a jury instruction on the statutory presumptions of intoxication was given over the defendant's objection. On these facts, this Court reversed the defendant's conviction for third offense DUI and remanded the matter to the trial court with instructions to determine whether the arresting officer had information prior to administration of the test that the arrest was for a third DUI. If it was determined that he did not have such information, this Court directed that a new trial be held and that the State be penalized for its noncompliance with the implied consent law with the loss of its right to revoke the defendant's driving privileges and with the forfeiture of the statutory presumptions of intoxication under SDCL 32–23–7.

[¶ 31.] The law enforcement failures represented in the above cases and the breakdown in law enforcement procedure in the instant case establish that the time has come for reconsideration of our holding in *Hartman* and for the imposition of a more severe sanction for noncompliance with the implied consent law.

[¶ 32.] Notwithstanding elimination of the right to refuse a chemical test in arrests for vehicular homicide and third offense DUI,[8] the implied consent law remains an important feature of South Dakota law extending to South Dakota motorists a right not guaranteed by the Constitution, "i.e., the right to refuse to submit to a chemical test of their bodily substances for a determination of blood alcohol content." *Hartman*, 256 N.W.2d at 135. Through the implied consent law, the South Dakota Legislature has enunciated a public policy that continues to grant this right of refusal to individuals who have a prior DUI conviction. *See* SDCL 32–23–10(1). Today's majority rewrites that policy by denying Herrmann his right of refusal and by permitting law enforcement to bypass that right whenever officers have a so called "good faith" belief that a person has more than one prior DUI conviction. Such a significant amendment of a clearly defined public policy should be left to the legislature that adopted the policy and should not be dictated by this Court.

[¶ 33.] A proper ruling in this case would not unfairly hamper DUI prosecutions in cases of this nature, but would place them on a proper footing. The implied consent law imposes special demands on law enforcement. As noted in *Buckingham*, 90 S.D. at 208–209, 240 N.W.2d at 89, the implied consent law imposes requirements on law enforcement "beyond those mandated by the *Schmerber* case. To hold otherwise would be to permit law enforcement officers to render [the implied consent law] nugatory at their whim."

[¶ 34.] What this Court wisely foresaw in *Buckingham* is the precise scenario that has unfolded. In the present case, upholding admissibility of the blood test result once again permits law enforcement to render the implied consent law nugatory

---

7. By the time of *Jacobson,* a blood test was mandatory on an arrest for third offense DUI.

8. *See* SDCL 32–23–10(1).

by acts of negligence and carelessness if not purposeful noncompliance. Contrary contentions that forfeiture of the statutory presumptions of intoxication adequately penalizes the State for its violation of the implied consent law are meritless in light of the body of common knowledge that education and public debate have engendered on the meaning of a 0.10 or 0.08 percent blood-alcohol test result. Therefore, to the extent that *Hartman* and its progeny hold that suppression of blood test results is not required for violation of the implied consent law, they should be overruled. If such a conclusion were reached, the following observation from *Buckingham* would again become relevant:

> If the legislature desires that a motorist arrested on a charge of driving while intoxicated shall no longer have the right to choose between consenting to a test and losing his license, then presumably the legislature will say so in terms as clear as it used in spelling out a motorist's rights under [the implied consent law].

*Buckingham,* 90 S.D. at 209, 240 N.W.2d at 89.

[¶ 35.] The Court's decision is rewarding law enforcement for acts of negligence and carelessness in violation of the driver's statutory right to refuse the blood test. Why should law enforcement reap the benefits of its own acts of negligence and carelessness in violation of the law? The answer is obvious: they should not be able to do so. The Court's decision should enforce the law as it is until the legislature changes it.

[¶ 36.] Based upon the foregoing, I dissent from the Court's decision on Issue Two and would hold that the trial court erred in denying Herrmann's motion to suppress his blood test result as evidence and that a fair trial is required.

[¶ 37.] AMUNDSON, Justice, joins this special writing.